IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 21, 2026

## STATE OF TENNESSEE v. MICHAEL WAYNE NORTON

**Appeal from the Criminal Court for Knox County**
No. 128531      Steven W. Sword, Judge

### No. E2025-00909-CCA-R3-CD

A Knox County jury convicted the Defendant, Michael Wayne Norton, of aggravated kidnapping, rape, aggravated assault, and domestic assault, and the trial court sentenced him to twenty years. On appeal, the Defendant contends that the evidence is insufficient to sustain his convictions. After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, P.J., delivered the opinion of the Court, in which TIMOTHY L. EASTER and JILL BARTEE AYERS, JJ., joined.

Jackson M. Fenner (on appeal), and Mark C. Hazlewood (at trial), Knoxville, Tennessee, for the appellant, Michael Wayne Norton.

Jonathan Skrmetti, Attorney General and Reporter; Ronald L. Coleman, Senior Assistant Attorney General; Joshua R. Gilbert, Assistant Attorney General (acting *pro hac vice*) Charme P. Allen, District Attorney General; and Jeannine Guzolek and Sean Roberts, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from interactions the Defendant had with his wife, some of which occurred in front of their children. For his actions, the Knox County grand jury indicted the Defendant for especially aggravated kidnapping, rape, aggravated assault, vandalism, interference with an emergency call, domestic assault, and coercion of a witness.

The Defendant's wife, the victim, testified that she and the Defendant had been together for sixteen years and had two sons, ages five and seven, the oldest of whom had

autism. The two had lived together in a two-bedroom farmhouse in Knoxville, Tennessee, for about thirteen years.

In June 2022, the victim had verbally asked the Defendant for a legal separation, but he did not agree. The two continued living together, although sleeping in separate rooms, until this incident on October 9, 2022. She identified and described the house and pictures of her house. She identified her bedroom, which had a door to the front porch. The door was not usable because the Defendant had screwed, caulked, and siliconed it shut, and wrapped it with plastic wrap. There was no way for her to exit the home from her bedroom. The Defendant slept in the living room, which they had turned into a second bedroom, with their two sons.

On October 9, 2022, the victim was working at Family Dollar and the Defendant was working for FedEx. The Defendant usually left for work around 6:00 a.m. and returned between 4:00 and 5:00 p.m. That day, he did not return home until 7:00 p.m., and the victim was cooking a spaghetti dinner and listening to music on her cell phone when he arrived. Her sons at the time were three and four years old and were in the kitchen talking to her while she cooked.

The victim's older son said, "Daddy's home," and the victim turned to look and saw him walk through the door. She returned to cooking dinner. The Defendant came up behind her and wrapped his arm around her neck. He said, "Tonight you're going to die, B***h." The victim said that she could not breathe, and the Defendant dragged her down the hall to the bedroom. She told her oldest son to call 911. Her son grabbed her phone, and the Defendant took the phone from him and threw it in the pot of boiling noodles. When the music she had been playing on her cell phone continued to play, he retrieved the phone from the pot, threw it in the washing machine and turned the washer on. The music was still playing, so he took the phone back out and hit it on the washer to break it. The phone fell apart and was destroyed.

The Defendant grabbed the victim by her neck and dragged her to the bedroom, threw her on the bed, and sat on her. He then hit her above her eye and on the top of her head with a closed fist. The Defendant told the victim she was going to die and the multiple ways he was going to kill her, including killing her in front of her children. The Defendant called the victim a "b***h," a "c**t," and a "whore" multiple times. The victim said she wiggled out from under the Defendant, and he grabbed a gun from a shelf drawer where they kept it and told her that if she moved, he was going to shoot her. The victim knew the gun was loaded. The Defendant told her to face the inoperable door in her bedroom and to get on her knees with her hands behind her back. She did so, and the Defendant handcuffed her. The victim had her back turned when the Defendant obtained the handcuffs, so she was unsure how he got them. She identified a photograph of the handcuffs.

2

The victim said that her sons watched all of this and, at one point, her older son jumped on the Defendant's back and screamed, "Quit hitting Mommy." The Defendant just pushed him away.

While she was handcuffed, the Defendant kept hitting her. He kicked her back and her stomach and told her she was not going to make it out of the house and that he was going to pull up the floorboard and bury her underneath the house. The victim saw FedEx tape in his hands. The Defendant began cutting off strips of tape and sticking it on the hutch in the kitchen. He asked the victim if the strips were big enough to fit around their sons' hands. He then told her that he was going to wrap her sons' hands up and he was going to set the house on fire and they were all going to burn alive. The Defendant told her that he wanted her to suffer and watch her own children die.

The Defendant told the victim that he would end all of it if she just agreed to remain married to him. The victim said she "gave in" and told the Defendant she would stay as his wife as long as it stopped. The victim saw the Defendant go into the laundry room with the gun and, when he returned, he no longer had the weapon. When the victim attempted to leave the bedroom, however, the Defendant forced her back. She was still handcuffed, so he caught her easily. The victim said the Defendant strangled her approximately eight times, and she lost consciousness on four of those occasions. She had difficulty swallowing for over a year after the choking incident. The Defendant removed the handcuffs from the victim around midnight.

After the victim agreed to stay, the Defendant told her that she was lucky because he was going to kill her and her sons. He further said that if she called the police, she would "be done." The victim said that she went back to cooking the spaghetti. She fed her sons, sent them to bed, and then went to bed herself.

The Defendant came in later and told her that he wanted to have sex with her. She told him that she did not want to, but the Defendant remained insistent. She felt she had no choice because she knew that if she told him "no" that he would again attack her. She was concerned for herself and her children. The Defendant sexually penetrated her, and she did not fight back out of fear of being attacked.

When the Defendant left for work the following day, the victim immediately called the police. She said she did not leave because the Defendant had disabled her car and it was not drivable. The police came, and they took pictures of her injuries. She had a black eye, and a bruise above her eye. She had three or four knots on the top of her head and was in pain. She found the gun in the laundry room and surrendered it to the responding police officers. She did not find the handcuffs until she was moving out of the house a

3

year and a half later, and she called the police and surrendered the handcuffs also. The victim identified pictures of her injuries, the gun, and the handcuffs.

The victim said that, after his arrest, the Defendant contacted her repeatedly through emails, phone calls, and letters.

During cross-examination, the victim agreed that, when the Defendant came home on October 9, everything seemed normal. The two had texted throughout the day and then smiled at each other when he arrived at home. She was unsure whether she told police that the Defendant said that "tonight you die, b***h," but she said that she was in shock when she spoke with them on October 10.

The victim expounded on the events, describing how she was asking the Defendant what was going on when he threw her phone in the boiling water. Because it had been a normal day, the Defendant's actions seemed sudden. The victim said that as the Defendant got her phone out of the noodles and put it in the washing machine, she gathered her children behind her in the hallway. The Defendant came toward her after he smashed her phone, and she tried to move away from him, but her kids were still in the hallway, and she did not want to leave them. She ran toward her children, and the Defendant grabbed her again, dragged her to the bedroom, threw her on the bed and sat on her back.

During cross-examination, the victim confirmed her story and went into more detail about some aspects, including some of the statements made by the Defendant. She added that the last time the Defendant choked her into unconsciousness, he thought she was dead and laughed when she regained consciousness.

The victim described the Defendant cutting the tape and asking if it was big enough for her sons' wrists. At that point, she asked the Defendant to take her sons, who watched all of this, to his mother's house. She offered to allow him to handcuff her to the bed as long as he took the boys out of the house and ensured their safety. The victim said that she must have said something the Defendant did not like because he came back into the bedroom and hit her on the side of her head.

This event lasted from 7:00 p.m. until midnight and ended when the victim told the Defendant she would remain married to him. After that, he went to the laundry room with the gun, returned without it, and unhandcuffed her. She finished cooking dinner and put her boys to sleep. She then got into bed and went to sleep. The Defendant came into her room and said he wanted to have sex with her. The victim told the Defendant that she did not feel like it, but the two had sex anyway. She agreed that she wanted him to believe that she still loved him and wanted to be with him, but she said she felt she had no choice.

4

In the morning, the Defendant left the home for an hour and returned before he left for work. After this, the victim's wallet and her sons' birth certificates were missing. When the Defendant left for work, she took the SIM card out of her phone and put it in her son's phone so she could call 911. Because her SIM card was in her son's phone, she also received text messages on that phone from the Defendant. The victim said that the police never asked her for the broken cellphone, which her son had thrown away.

Aaron Turner, the assistant facility commander at the Knox County Jail, testified that the jail records a copy of all emails and text messages sent by inmates. He was tasked with retrieving messages sent by the Defendant to the victim's email account between October 13, 2022, and October 16, 2022. In the messages, the Defendant repeatedly asked the victim to drop the charges so he could get out and work. He says he got in with the wrong crowd. She told him that she had no money to buy things she needed for their sons, and he suggested she drop the charges, so he could work, or ask someone for a loan. The Defendant told her that her wallet and their sons' birth certificates were in the washing machine, and he apologized.

The Defendant informed the victim that he had a Cash App card that she could come and retrieve from the jail that had some money on it. He said he signed a property release form for her to get it. He then asked her to drop the charges against him. He said that if she did not that he would never be able to find a good paying job. He offered to stay at his mother's house, and she encouraged him to sell his tools for money. The victim said she still could not find the birth certificates, and the Defendant said he did not know where they were and to look in her car.

The messages continued to discuss pawning items and getting the Cash App card from the jail. The Defendant in one message thanked the victim for dropping the charges against him and then later told her that she had to tell "them you do not want to press charges and drop all charges to get me released." He then told her that this was his last FedEx pay period and after this the money was gone. The Defendant repeatedly asked her to drop the charges and told her he was sorry for what had happened.

During cross-examination, Mr. Turner agreed that inmates sometimes used other inmates' accounts to send messages.

Detective Logan Sammons and Detective Jeff Bryant, with the Knox County Sheriff's Department, responded to the victim's call to law enforcement. Patrol officers had already detained the Defendant when they arrived. Detective Sammons left the scene and went a short distance to interview Ms. Norton. He offered her *Miranda* warnings, unsure of the direction the investigation would take, and she agreed to speak with him. The

officer observed her injuries, which included markings on her wrists that he found consistent with a handcuff injury.

Detective Sammons and Detective Bryant also spoke with the Defendant. They gave him his *Miranda* warnings, and the Defendant agreed to speak with them. In his recorded statement the Defendant said that, when he came home, there was "pot smoke" in the house, and he could not be around marijuana for his job at FedEx. He and the victim got into an argument about this. During the argument, the Defendant admitted that he had an arm around her neck and took her into the bedroom. He held her down on the bed and placed the victim in handcuffs. He estimated she was in handcuffs for between thirty minutes and an hour. The Defendant said that he got a gun but that he pointed it at himself and not at the victim. He said he told the victim he was going to end himself. He agreed that he threatened to burn the house down but said that he never threatened to hurt their sons.

The State rested, and the Defendant testified. He said that, when he returned from work on the day of this incident, the house smelled of marijuana. The victim was by the stove, cooking and playing music, and he told her that he wanted to talk to her. The victim responded that the Defendant was not her father. The Defendant took the victim's phone and threw it toward an empty pan. This upset the victim, who then hit him with a rolling pin on the left side. The Defendant said he spun around, tossed her phone back on the counter, grabbed the rolling pin, and threw it in the sink. The victim hit the Defendant in his testicles and "took off" to the bedroom.

The Defendant said it took him some time to catch his breath and then he followed her to the bedroom. The victim had the gun out with her back toward the Defendant. The Defendant put his arm around the victim's neck and wrestled with her to get the gun away from her. He said he jerked the gun out of her hand and put it in a drawer. The victim started elbowing him, and the two were wrestling. They fell off the bed, and the victim hit her head on the dresser. They got up and the victim started throwing punches at him, so he handcuffed her.

The Defendant denied that either of his children jumped on him. The Defendant said that he told the victim to calm down, and she did. She then went to the kitchen and retrieved her phone, which was in working condition. The Defendant said he went and got their sons, got them calmed down, gave them a bottle and put them in the living room. He let the victim calm down while he sat in the living room with the children. The Defendant said he went back into the kitchen where the victim was and told her that he wanted a divorce and wanted custody of the kids because she was smoking marijuana. The victim came into the living room, and they each rocked one of their sons to sleep.

6

The Defendant said that the victim then said that she was cold and that she wanted him to come to bed with her. She never said she did not want to have sex with him. The next morning, the Defendant went to Food City to get milk and diapers for their sons. He came home and then went to work. He went to Sam's Club on the way home and, when he arrived back at home, police officers were present.

The Defendant said the argument lasted approximately thirty minutes in total and he never threatened the victim with a gun but that she threatened him with a gun. He denied ever saying that he would burn the house down or that he would kill his kids. The Defendant said that he never handcuffed the victim, never choked, punched or kicked her. He lied to Detective Sammons because he thought he would be let go if he agreed with the detective.

During cross-examination, the Defendant agreed that he returned home on October 10, 2022, at around 10:00 a.m. while still driving his FedEx truck. When he arrived and police officers were present, he did not ask about the welfare of his wife and children but instead asked if someone could come and get the FedEx truck. He agreed that he never told the detectives that the victim got out the gun or that he put his arm around her neck to get the gun from her. He never told the officers that the victim struck him in the testicles or elbowed him in his side. He agreed he told the detective that he handcuffed the victim for between thirty minutes and an hour, but he denied ever owning handcuffs and said he did not handcuff her. He said that he lied to the detectives and that he only held her hands for between five to ten minutes.

The Defendant said that he incorrectly told the detectives that he put the victim's phone in the washing machine and that it was his phone that she put in the washing machine. The Defendant then said that the gun "got pointed at" him when he took it away from the victim, but he said he never pointed the gun at himself and said that he was going to end himself.

The Defendant agreed that he sent all the messages to the victim while he was incarcerated. He agreed that he repeatedly apologized but was saying that he was sorry for wanting a divorce and full custody of the kids. The Defendant agreed that the messages did not reference the divorce or custody. The Defendant said that, when he placed the victim in a choke hold, he applied "very little" pressure.

On redirect, the Defendant said he lied to the detectives because he did not want his autistic son to lose his mother. He said his trial testimony was the truth.

During recross, he agreed that his testimony was that he wanted full custody of his autistic son at the time, so he would have been taking his autistic son away from his mother.

Based upon this evidence, the jury convicted the Defendant of aggravated kidnapping, rape, aggravated assault, and domestic assault, and the trial court sentenced him to twenty years. It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that the evidence is insufficient to support his convictions for aggravated kidnapping, rape, aggravated assault, and domestic assault. The State counters that there was sufficient evidence to sustain his convictions. It notes that the victim's testimony was supported by pictures of her injuries and a video recorded admission from the Defendant.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State."

*State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

## A. Aggravated Kidnapping

To convict the Defendant of aggravated kidnapping as charged in the indictment, the State was required to prove that the Defendant falsely imprisoned the victim as defined in Tennessee Code Annotated section 39-13-302 and was in possession of a deadly weapon or threatened the use of a deadly weapon. T.C.A. § 39-13-304. False imprisonment occurs when a person knowingly removes or confines another unlawfully as to interfere substantially with the other's liberty. T.C.A. § 39-13-302(a). Whether the evidence presented establishes each and every element of kidnapping, including whether the interference was substantial or merely trivial, is a question for the jury. *State v. White*, 362 S.W.3d 559, 577 (Tenn. 2012).

The Defendant contends that the only evidence provided regarding the removal or confinement of the victim, and whether he had a deadly weapon, was provided by the victim and the Defendant. The Defendant asserts that the confinement of the victim was necessary because the victim had a gun, so the evidence is insufficient to support the conviction.

We conclude that the evidence is sufficient to support the Defendant's conviction.

9

The victim said that the Defendant dragged the victim, who was in a headlock, to the bedroom where he at first threw her on the bed and sat on her. When she attempted to leave, he handcuffed her and threatened her with a gun, forcing her to stay in the bedroom. We first note that the testimony of a victim is sufficient to sustain a conviction without corroboration. *State v. Royston*, No. E2014-00018-CCA-R3-CD, 2015 WL 159813, at *9 (Tenn. Crim. App. Jan. 13, 2015) (citing *State v. Smith*, 42 S.W.3d 101, 106 (Tenn. Crim. App. 2000)), *perm. app. denied* (Tenn. May 14, 2015). There was, however, other corroboration to the victim's testimony. The Defendant said that he handcuffed the victim and physically restrained her. The victim had injuries on her wrist comporting with handcuff injuries, which were photographed, and the photographs were admitted into evidence. The Defendant told law enforcement officers that he had a gun but said that he pointed it at himself and not the victim. The victim showed the officers the gun when they arrived, and they took possession of the weapon. This evidence is sufficient to sustain the Defendant's conviction for aggravated kidnapping, and he is not entitled to relief.

## B. Rape

The jury convicted the Defendant of rape. Rape is the "unlawful sexual penetration of a victim by the defendant" and "force or coercion is used to accomplish the act." T.C.A. § 39-13-503. The Code defines "force" as "compulsion by the use of physical power or violence" and expressly declares that force "shall be broadly construed." T.C.A. § 39-11-106(a)(12). "Coercion," as used in the statute proscribing rape, is defined as "threat of kidnapping, extortion, force or violence to be performed immediately or in the future . . . ." T.C.A. § 39-13-501(1). The Defendant contends that the State failed to prove that the Defendant coerced the victim into having sex with him. The State counters that the Defendant's violent behavior with her established a framework for finding an implicit threat of violence.

The evidence, viewed in the light most favorable to the State, proved that the victim had asked the Defendant for a divorce. The two were sleeping in separate bedrooms and were not intimate. The Defendant came home after work one evening while she was cooking dinner and attacked her. He took her phone and broke it. He grabbed her around the neck from behind and dragged her to the bedroom where he threw her on the bed and sat on her. He choked her so hard several times that she lost consciousness. He punched her in the head, kicked her, and handcuffed her. He held a gun to her head and threatened to kill her and to make her watch her children burn when he burned the house down with them inside. The Defendant only stopped his threats and abuse when the victim agreed to stay with him as his wife. After he calmed down, and the victim put their sons to bed, the Defendant came into the victim's bedroom and told her that he wanted to have sex.

The victim told him that she did not want to, but the Defendant remained insistent. She felt she had no choice because she knew that if she told him "no" that he would again attack her. She was concerned for herself and her children. The Defendant sexually penetrated her, and she did not fight back out of fear of being attacked.

In the context of coercion, this court has held that an "implicit threat of violence" can accomplish the "force or violence" factor pursuant to Code section 39-13-501(1). *See State v. Lee Roy Gass*, No. E2000-00810-CCA-R3-CD, 2001 WL 767011 (Tenn. Crim. App., Knoxville, July 3, 2001), *no perm. App. filed*; *State v. Leland Ray Reeves*, No. 01C01-9711-CR-00515 1999 WL 155926 (Tenn. Crim. App. Mar. 23, 1999), *perm. app. denied* (Tenn.1999). In a recent case by our court, *State v. Keith Richardson*, we discussed a similar set of facts but in the context of aggravated rape.

> [T]he State was required to prove that the [d]efendant sexually penetrated the victim, that the [d]efendant used force or coercion to accomplish the act, and that the [d]efendant was armed with a weapon. The evidence at trial, viewed in the light most favorable to the State, sufficiently established each of these elements. The victim testified that on March 5, 2017, while she and the [d]efendant were home alone, the [d]efendant "decided he wanted to go again." The victim and the [d]efendant smoked marijuana together, and the [d]efendant began to "get handsy." When the victim stepped backward to avoid the Defendant, he tripped over the prongs of the nearby fireplace. After the [d]efendant recovered his balance, he picked up a hammer, swung it at the victim's head, and threatened to hit her. The victim testified that she was afraid and that she knew, at this point, that the [d]efendant wanted to do "[s]exual things" with her. The victim and the [d]efendant went to the victim's bed, whereupon the [d]efendant dropped the hammer. The [d]efendant then inserted his penis into the victim's vagina. This proof is sufficient to establish the [d]efendant's guilt of the charged offense of aggravated rape.

No. M2025-00578-CCA-R3-CD, 2026 WL 1803955, at *11 (Tenn. Crim. App. June 23, 2026), *perm. app. not yet filed*.

We conclude that the evidence supports the jury's finding that the Defendant committed rape. The Defendant had just beaten the victim over the course of five hours and threatened to kill the victim and her children. He handcuffed her, hit her, kicked her, and threatened her with a gun. He cut strips of tape, asking if they were long enough for her children's wrists because he was going to bind her and her children and make her watch as he burned them all. He only stopped and calmed down when the victim agreed to remain his wife. The Defendant then entered her bedroom, which was separate from his own, and

11

said that he wanted to have sex with her. She said that she did not want to, but he was insistent. The victim said she felt as if she had no choice because he had just been so violent. This evidence is sufficient to support a finding that the Defendant used an implicit threat of violence to accomplish the rape, so as to satisfy a finding of coercion. The evidence supports his conviction for rape, and the Defendant is not entitled to relief.

## C. Aggravated Assault

The Defendant contends that the evidence is insufficient to sustain his conviction for aggravated assault because the only evidence that he strangled the victim was her own testimony. He further notes that the only evidence of her injury was a small scratch to her neck. The State counters that the victim's testimony is sufficient to support the jury's verdict.

As relevant in this case, aggravated assault is assault that involves strangulation or attempted strangulation. T.C.A. § 39-13-102(a)(1)(A)(iv). "Assault occurs when a person '[i]ntentionally, knowingly or recklessly causes bodily injury to another.'" *State v. Maney*, No. M2017-01711-CCA-R3-CD, 2018 WL 3700927, at *3 (Tenn. Crim. App. Aug. 3, 2018) (quoting T.C.A. § 39-13-101(a)(1)). Strangulation occurs when a person:

> intentionally or knowingly imped[es] normal breathing or circulation of the blood by applying pressure to the throat or neck or by blocking the nose and mouth of another person, regardless of whether that conduct results in any visible injury or whether the person has any intent to kill or protractedly injure the victim.

T.C.A. § 39-13-102(a)(2).

The Defendant mentions that there was only a small scratch on the victim's neck. To the extent that he is arguing that the State did not prove serious bodily injury, it was not so required. The Defendant was charged with, and convicted of, aggravated assault by strangulation. Under the statute, strangulation and serious bodily injury are alternative means of establishing the aggravated nature of the assault. T.C.A. § 39-13-102(a)(2) (aggravated assault occurs when a person intentionally or knowingly commits an assault that "[r]esults in serious bodily injury to another; . . . or [i]nvolved strangulation or attempted strangulation[.]")

The Defendant also seemingly contends that there was insufficient proof that the victim's breathing was affected by the Defendant's arm strangling her. Aggravated assault by strangulation does not require serious impairment of the ability to breathe. Under the statute, strangulation occurred when Defendant applied pressure to the victim's neck and

12

impeded her normal breathing. *See* T.C.A. § 39-13-102(a)(2). The victim testified that Defendant placed his arm around her neck and applied pressure. She said that his actions caused her to lose consciousness. The Defendant acknowledged to police that he held the victim in a choke hold from behind. He reiterated this at trial but said he applied very little pressure and only did so to wrestle a gun from the victim. The victim did also have a scratch on her neck, documented by law enforcement.

Finally, Defendant asserts that the victim's testimony alone was insufficient to support the verdict. As previously stated, the jury can accredit the victim's testimony that the Defendant strangled her and that it affected her breathing. *See Bland*, 958 S.W.2d at 659. It is the jury's duty to resolve conflicts in the evidence, and it is not this court's role to substitute its own judgments and inferences for that of the jury. *See State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012). When viewed in the light most favorable to the State, the evidence sufficiently shows that Defendant applied pressure to the victim's neck, impairing her ability to breathe normally. The victim said that she lost consciousness and that, at one point, when she regained consciousness, the Defendant was laughing. The victim said that she had difficulty swallowing for over a year after this incident. The evidence is sufficient to sustain Defendant's conviction for aggravated assault by strangulation. The Defendant is not entitled to relief on this issue.

### D. Domestic Assault

The Defendant contends that there is insufficient proof that he knowingly caused bodily injury to the victim. The State counters first that the Defendant waived this issue by failing to adequately brief it and further that the evidence is sufficient to support his conviction. We will address this claim on its merits.

"A person commits assault who . . . knowingly . . . causes bodily injury to another[.]" T.C.A. § 39-13-111(a)(1). A defendant commits domestic assault when he assaults a domestic abuse victim. T.C.A. § 39-13-111. A domestic abuse victim includes current or former spouses. T.C.A. § 39-13-111. This testimony sufficiently established that the Defendant knowingly caused bodily injury to his wife. He is not entitled to relief on this issue.

### III. Conclusion

Based on the foregoing reasoning and authorities, we affirm the trial court's judgments.

_____*ROBERT W. WEDEMEYER*_____
ROBERT W. WEDEMEYER, PRESIDING JUDGE

13